## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:22-cr-211 (JAM) |
| KARLIS MANSON *et al.*, Defendants. | |

### ORDER DENYING MOTION TO SUPPRESS

Defendant Karlis Manson has moved to suppress evidence that the government intends to introduce against him at trial. I will deny the motion.

#### BACKGROUND

The indictment charges Manson with possessing with intent to distribute controlled substances on or about October 5, 2022. The investigation of Manson involved the execution of federal search warrants at two locations—at the "Hole-N-Da-Wall" store at 136 Barbour Street in Hartford, Connecticut and at a U-Haul storage facility in Plainville, Connecticut. The execution of these search warrants led in turn to the recovery of narcotics from three places— from a U-Haul storage unit that was registered in Manson's mother's name, from Manson's person while he was at 136 Barbour Street during the execution of the search warrant, and from Manson's car that was parked outside 136 Barbour Street.

The affidavit in support of the federal search warrants relied in part on information from a confidential informant who "has been found to be credible and reliable in past investigations."[1] The informant told law enforcement in September 2022 that Manson was operating a drug trafficking organization out of the store at 136 Barbour Street.[2] The informant also told law

---

[1] Doc. #85-2 at 6 (¶ 9) (search warrant affidavit).
[2] *Ibid.*

enforcement that Manson drove a blue Infiniti SUV and that he stored illegal drugs at various "stash" locations including at a U-Haul storage facility in Plainville, Connecticut.[3]

According to the affidavit, the government corroborated parts of the informant's allegations. For example, law enforcement observed a blue Infiniti SUV for extended periods of time at 136 Barbour Street.[4] Law enforcement also observed Manson leave his home one day in West Hartford, make a stop at the U-Haul facility in Plainville, and then go directly to 136 Barbour Street.[5] In addition, law enforcement learned by subpoena to the U-Haul facility that there were two units registered in the names of Manson's mother and step-father.[6]

According to the affidavit, a drug-sniffing dog named K-9 Kurt was brought to the U-Haul facility, and K-9 Kurt gave a positive alert outside both these units.[7] The affidavit states that K-9 Kurt "has been trained and certified in Narcotic Detection by the Connecticut State Police K9 Unit and Forensic laboratory in accordance with NESPAC [New England State Police Administrators Conference] standards."[8] The affidavit further states that K-9 Kurt "has a proven track record of reliability and accuracy detecting said [narcotic] odors in both training and investigative deployment."[9]

On the morning of October 5, 2022, U.S. Magistrate Judge Robert A. Richardson approved search warrants for 136 Barbour Street and for the two storage units at the U-Haul facility in Plainville. Both warrants were executed later that day as described below.

---

[3] *Id.* at 8 (¶¶ 12–13); Doc. #85-1 (DEA report of investigation).
[4] Doc. #85-2 at 8 (¶ 12).
[5] *Id.* at 8–9 (¶ 13).
[6] *Id.* at 9–10 (¶¶ 14–15).
[7] *Id.* at 10–11 (¶¶ 16–17).
[8] *Id.* at 11 (¶ 17).
[9] *Ibid.*

At approximately 5:30 p.m., a team of law enforcement officers began the execution of the search warrant at the store at 136 Barbour Street.[10] There they found Manson among many other people, and the search recovered a wide range of firearms, illegal drugs, and drug processing items inside the store.[11]

An officer conducted a pat-down search of Manson and recovered from him about 5.6 grams of suspected crack cocaine and 4.7 grams of suspected fentanyl.[12] Manson does not dispute the government's account that these narcotics were found during the pat-down when law enforcement officers saw and felt a large bulge in the side of Manson's underwear just below his waist band.[13]

Manson's blue Infiniti SUV was parked outside 136 Barbour Street.[14] After K-9 Kurt alerted to the presence of narcotics on the door and driver's handle, law enforcement opened the car by using keys which were observed near Manson in the back room of the store.[15] Inside the car was 6.6 kilograms of marijuana in numerous vacuum-sealed bags, more than 450 grams of powder cocaine, and an undetermined amount of U.S. currency in black plastic bags.[16] The body-camera video of the search of the car reflects that it took place a few minutes after 7:00 p.m.[17]

In the meantime, beginning at approximately 6:00 p.m., a separate law enforcement team executed the second search warrant at the U-Haul facility in Plainville.[18] They had a manager cut

---

[10] Doc. #86-6 at 1.
[11] Doc. #46 at 5–6; Doc. #86-6 at 2–12. Manson has not moved to suppress evidence found in the store, and the government stated at oral argument that it will not seek at trial to attribute these firearms, drugs, and drug paraphernalia specifically to Manson.
[12] Doc. #46 at 6.
[13] *Id.* at 15.
[14] Doc. #86-6 at 3.
[15] *Ibid.*
[16] *Ibid.*; Doc. #46 at 7.
[17] Doc. #86-8 (notice of manual filing).
[18] Doc. #86-4 at 1.

the lock to gain access to the storage unit (#1476) that was registered in the name of Manson's mother.[19] Inside they found dozens of vacuums-sealed bags with marijuana.[20] They also found several documents with Manson's name on them, including a State of Connecticut vehicle registration certificate.[21]

Law enforcement additionally searched the second storage unit (#1631) that was registered in Manson's stepfather's name and where K-9 Kurt had also alerted, but there were no narcotics found inside the second unit.[22] The search of this second unit concluded at approximately 6:41 p.m.[23]

On the same evening, law enforcement officers went to the home of Manson's brother in Vernon, Connecticut. The confidential informant had told them that Manson stored guns in a safe that was located there.[24] A drug-sniffing dog—K-9 Franco—alerted to the presence of narcotics on or inside the safe.[25] After receiving the brother's consent to a search, law enforcement opened the safe at approximately 8:30 p.m., and they found several firearms but no narcotics inside.[26]

Manson has moved to suppress evidence seized from three locations: from the storage unit where marijuana was found (#1476), from the search of his person where crack cocaine and fentanyl were found, and from the search of his car where marijuana and powder cocaine were found.[27] The government opposes his motion.[28]

---

[19] *Id.* at 2.
[20] *Ibid.*
[21] *Id.* at 2–4.
[22] *Id.* at 1–2.
[23] *Id.* at 2.
[24] Doc. #85-2 at 8 (¶ 12).
[25] Doc. #86-1 at 1–2.
[26] Doc. #86-2 at 2–4.
[27] Doc. #40.
[28] Doc. #46.

I held oral argument on the motion and queried whether Manson believed there were grounds for an evidentiary hearing. Manson requested an evidentiary hearing to challenge the certification and training of K-9 Kurt. I ordered the government to promptly disclose the certification and training records for K-9 Kurt, and Manson has since moved to withdraw his request for an evidentiary hearing.[29]

DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. To effectuate this right, courts have created an exclusionary rule "that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009); *United States v. Jones*, 43 F.4th 94, 110–11 (2d Cir. 2022).[30]

### *Search of U-Haul storage unit*

Manson argues that the affidavit in support of the search warrant for the U-Haul storage unit #1476 was not supported by probable cause. "Probable cause exists when the 'totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Bodnar*, 37 F.4th 833, 841 (2d Cir. 2022) (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)). As the Supreme Court has explained, the probable cause standard is not a high bar and requires only a probability or substantial chance of

---

[29] Doc. #108.

[30] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

criminal activity, not an actual showing of such activity. *See D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018).

The search warrant affidavit recounts (1) that the confidential informant—who was known to be reliable—stated that the Plainville U-Haul facility was a stash location for Manson, (2) that law enforcement officers saw Manson go to the U-Haul location from his home en route to 136 Barbour Street, (3) that unit #1476 was registered in the name of Manson's mother, and (4) that K-9 Kurt alerted to the outside of unit #1476. In my view, all of this was clearly enough to establish a fair probability that contraband would be found inside unit #1476.

Indeed, K-9 Kurt's alert—standing alone—was enough to establish probable cause. Manson does not dispute that K-9 Kurt alerted outside unit #1476. Nor does he any longer dispute that K-9 Kurt completed the training and certification programs as described in the affidavit or the integrity of these training and certification programs. As the Supreme Court has made clear, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," and "[i]f a bona fide organization has certified a dog ... a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013); *see also United States v. McKenzie*, 13 F.4th 223, 237 (2d Cir. 2021) (probable cause existed where defendant "fails to contradict the warrant application's assertion that the canine 'gave a positive alert for the presence of a narcotic and/or marijuana'" and where the defendant "has not challenged the reliability of the dog or the alert as to the Jeep").

The only conflicting evidence cited by Manson are several instances of alleged false positive alerts: (1) that K-9 Kurt alerted to narcotics outside unit #1631 on October 3, 2022, but that no narcotics were found when that unit was later searched on the evening of October 5,

2022; (2) that K-9 Kurt alerted to certain areas inside Manson's car when it was searched on the evening of October 5, 2022, but that no narcotics were found in those specific areas; (3) that K-9 Franco alerted to narcotics inside the safe at Manson's brother's house that was searched on the evening of October 5, 2022, but that no narcotics were found inside the safe; and (4) that K-9 Kurt alerted to narcotics inside a car in January 2023, but no narcotics were found inside the car.[31]

The problem with Manson's argument is that all these alleged instances of K-9 error occurred *after* the submission and approval of the search warrant affidavit on the morning of October 5, 2022. Whether probable cause exists to support a search warrant is judged by reference to what facts were known to law enforcement *at the time* that the search warrant issued, not at some later time. "[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210 (1932); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Manson does not point to any evidence suggesting that law enforcement had reason to suspect the accuracy of K-9 Kurt's alerts at any time prior to when they applied for the search warrant and conducted their search of unit #1476.

Nor is there much to be said of Manson's allegations that there were some false alerts. As the Supreme Court noted in *Harris*, a false alert may mean simply that the dog "smelled the residual odor of drugs previously in" the location and thus "may not have made a mistake at all." 568 U.S. at 245–46.

---

[31] Doc. #86 at 6–7.

Manson also complains that the affidavit does not advise how many times K-9 Kurt has made false alerts before. But, as the Second Circuit has explained, "field performance records [of a drug detection dog] are not required for the prosecution to establish probable cause." *United States v. Foreste*, 780 F.3d 518, 528 (2d Cir. 2015). And probable cause may exist even if a properly trained and certified drug detection dog is not correct 100% of the time.

Lastly, even if I assumed that the affidavit did not set forth probable cause, Manson comes nowhere close to showing that the search warrant affidavit was so obviously deficient on its face that the exclusionary rule should be applied. In the absence of such an obvious deficiency or any allegation of a material misrepresentation or omission in the affidavit, the government is entitled to rely on the magistrate judge's determination that there was probable cause. *See United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022). Accordingly, I will deny Manson's motion to suppress evidence searched and seized from unit #1476.

### *Search of Manson's person*

Manson next moves to suppress the evidence that was seized from his person during the course of the execution of the search warrant at 136 Barbour Street. But his argument is muddled. In his papers, he seems to challenge the basis for probable cause to support the search warrant for 136 Barbour Street as if the search warrant for 136 Barbour Street also extended to the search of his person.[32] But this assumption is wrong because the warrant papers make no request for authority to search Manson's person.

At oral argument, Manson shifted his ground to claim that he was making an argument under the fruit-of-the-poisonous-tree doctrine. Subject to the limitations discussed below, the

---

[32] Doc. #40-1 at 11–12.

fruit-of-the-poisonous-tree doctrine generally allows a court to exclude evidence if it was recovered as a result of a prior illegal search or seizure. That is, "the exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

According to Manson, because law enforcement lacked probable cause to conduct a lawful search of 136 Barbour Street, then law enforcement should never have been in a position to have conducted the pat-down search of Manson's person that led to the seizure of narcotics. In other words, he maintains that there was a "poisonous tree" (the illegal search of 136 Barbour Street) that produced excludable "fruits" (the narcotics seized from Manson's person).

But even if Manson is correct that there was no probable cause to support the search warrant for 136 Barbour Street, this did not infringe his *own* Fourth Amendment rights. He does not claim to own or have any possessory interest in the premises of 136 Barbour Street. Nor does he claim to have any legitimate expectation of privacy at 136 Barbour Street. Indeed, rather than suggesting that he had any personal possessory or privacy interest inside the store, Manson describes the store as no more than a "bodega" that "serves as a 'hang out' for people of the North End of Hartford."[33]

As the Supreme Court has explained, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," and "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). Therefore, "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in

---

[33] Doc. #40-1 at 4.

violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (*per curiam*) (emphasis in original). But because the execution of a search warrant at 136 Barbour Street did not infringe on Manson's own Fourth Amendment rights, he has no standing to complain that probable cause was lacking to support issuance of the search warrant.

And this lack of standing to challenge the basis for the search warrant dooms Manson's fruit-of-the-poisonous-tree argument. That is because the fruit-of-the-poisonous-tree doctrine does not apply to a party who has no standing to challenge the alleged illegality that led to the evidentiary fruits which the party seeks to suppress. The Supreme Court made this clear in its seminal fruit-of-the-poisonous-tree case—*Wong Sun v. United States*, 371 U.S. 471 (1963)— when it ruled that, despite an initial illegal search of one defendant's premises, a second defendant who had no standing to challenge the search of the first defendant's premises could not complain about the police's use of the fruits of that unlawful search to later conduct an additional search and seizure of incriminating evidence that was used against the second defendant. *See id.* at 491–92 (explaining that although "this ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun," because "[t]he exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee," and "[t]he seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial").

Thus, as one court has observed, "[u]nder *Wong Sun*, a party seeking to suppress evidence as a fruit of the poisonous tree must have suffered the initial Fourth Amendment

violation that led to the discovery of later lawfully obtained evidence." *United States v. Lamell*, 2012 WL 5285383, at *5 (D. Vt. 2012). Put differently, the fruit-of-the-poisonous-tree doctrine does not apply if the proverbial tree was not poisonous to the defendant in the first place; "the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment violation which constitutes the poisonous tree." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1117 (10th Cir. 2006). Therefore, even assuming that the search warrant for 136 Barbour Street was issued without probable cause, Manson cannot invoke the fruit-of-the-poisonous-tree doctrine as grounds to challenge the search of his person by law enforcement agents while they were executing the search warrant at 136 Barbour Street.

Manson does not otherwise challenge the lawfulness of the search of his person at 136 Barbour Street. For its part, the government contends that law enforcement detained Manson during the course of the execution of the search warrant, that law enforcement frisked him for weapons, and that law enforcement saw a bulge beneath his underwear and that the bulge turned out to be narcotics. Manson does not dispute the government's recitation, much less has he made any initial showing of impropriety with respect to the predicate for and manner of execution of the search of his person. Nor has he requested an evidentiary hearing concerning the details of this search of his person.

On the basis of the government's unchallenged recitation of the facts, I conclude there are no grounds for Manson to challenge the search of his person. First, it is well established that officers executing a search warrant may detain the occupants of the premises while a proper search is conducted. *See Bailey v. United States*, 568 U.S. 186, 193 (2013).

Second, it is also well-established that officers may pat-down an occupant of the premises for weapons if they have a reasonable suspicion that the occupant is armed and dangerous. *See*

*Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991). Here, law enforcement had already

recovered guns at the scene and, as noted in the search warrant affidavit, the confidential

informant advised law enforcement that Manson "always carries" a gun.[34]

      Third, as the Second Circuit has noted in a similar context, "[t]he fact that the pat-down

revealed narcotics rather than a weapon did not make the frisk impermissible. Where the officers

have been informed that a given person is dealing in narcotics, and during a permissible pat-

down for weapons they feel something that their experience tells them is narcotics, the pat-down

gives them probable cause to search the suspect for drugs." *United States v. Salazar*, 945 F.2d

47, 51 (2d Cir. 1991).

      In short, despite Manson's claim that there was no probable cause to support the search

warrant for 136 Barbour Street, he has failed to show that any lack of probable cause for a search

of the premises justifies exclusion of evidence seized from his person. Nor does Manson attempt

to show that the search of his person was otherwise improper. Accordingly, I will deny the

motion to suppress with respect to the search of Manson's person.

      ***Search of Manson's car***

      Lastly, Manson challenges the search of his car. It is well established under the so-called

"automobile exception" to the warrant requirement of the Fourth Amendment that the police may

search a car without a warrant provided that they have probable cause to believe that there is

contraband or other evidence of a crime inside. The rationale for this exception is the ready

mobility of an automobile as well as the diminished expectation of privacy that one has in a car

that travels on public roadways rather than in one's home. *See California v. Carney*, 471 U.S.

386, 391 (1985).

---

[34] Doc. #85-2 at 6 (¶ 9).

Manson first argues that he was in police custody when his car was searched and that the automobile exception does not apply when the owner or driver of the car is in custody or in no position to move or escape with the car. But, as the government points out, the Second Circuit has rejected this argument, concluding that there need be no showing that the car is at risk of being driven away. *See United States v. Howard*, 489 F.3d 484, 493–94 (2d Cir. 2007). Manson's reply brief makes no effort to respond to this precedent, and he conceded the point at oral argument.

Manson next argues that there was no probable cause to search the car. But here again I conclude that probable cause was established by the alert of the trained drug detection dog K-9 Kurt—this time his alert to the driver's handle and door of the car. All the same reasons I have previously discussed with respect to K-9 Kurt's alert at the U-Haul facility apply with equal force here.

The only possible point of distinction is that the negative search results for unit #1631 occurred about a half hour or so before K-9 Kurt alerted to the outside of the car at 136 Barbour Street. But there is no evidence that the negative result for the search of unit #1631 in Plainville was communicated to the officers conducting the search of Manson's car in Hartford. There is otherwise no evidence to suggest that these officers had grounds to doubt the reliability of K-9 Kurt's alert to the outside of Manson's car. Accordingly, I will deny the motion to suppress evidence seized from Manson's car.

CONCLUSION

For the reasons set forth above, the Court DENIES defendant Karlis Manson's motion to suppress (Doc. #40).

It is so ordered.

Dated at New Haven this 9th day of August 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

14